# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**NEIL ROSSMAN,**                                    Chapter 7
     Debtor                              Case No. 10-18534-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**NEIL ROSSMAN,**
     Plaintiff
v.                                                   Adv. P. No. 11-1006
**UNITED STATES OF AMERICA,**
**DEPARTMENT OF THE TREASURY,**
**INTERNAL REVENUE SERVICE, and**
**GARY W. CRUICKSHANK,**
**CHAPTER 7 TRUSTEE,**
     Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the First Amended Complaint for Determination of

Dischargeability of Indebtedness (the "Complaint") pursuant to 11 U.S.C. § 523(a)(1)(C)

filed by Neil Rossman ("Rossman" or the "Debtor").  Through his Complaint, Rossman

seeks  a judgment determining that assessed but unpaid federal income tax liabilities for

the tax year 1986 and the assessed and unassessed interest and penalties with respect to those tax liabilities are dischargeable in his bankruptcy case, as well as all penalties, "additions to tax" as that term is used in the Internal Revenue Code[1] whether assessed or unassessed, which were imposed with respect to a transaction or event that occurred prior to three (3) years before August 5, 2010, the date he filed his bankruptcy petition, are dischargeable, regardless of whether the underlying tax liability is dischargeable. The Defendant United States of America, Department of the Treasury, Internal Revenue Service (the "IRS"), filed an Answer to the Debtor's Complaint. The Chapter 7 Trustee was named as a defendant and served with the Amended Complaint as an interested party but has not participated in these proceedings.[2]

The Court conducted a two-day trial on August 7, 2012 and August 8, 2012 at which two witnesses testified, Rossman and Donald Guild, a revenue officer and technical advisor with the Special Advisory Group of the IRS located in Boston, Massachusetts. Additionally, the parties introduced numerous exhibits into evidence. Pursuant to post-trial motions, the Court permitted the parties to submit additional exhibits and portions of the deposition testimony of Gerard Miller, an attorney with the Tax Division of the Department of Justice.

---

[1] *See* 26 U.S.C. §§6652, 6653, 6654, 6659, 6661, 6662, 6663 and/or 6621(c) and/or (d).

[2] The Court shall enter an order dismissing the Chapter Trustee as a defendant as he is not a proper party to the proceeding and the Complaint contains no claim against him.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b). This is a core proceeding within the meaning of 28 U.S.C. §157(b)(2)(I).   The  IRS does not contest this Court's jurisdiction except as to a re-determination of the Debtor's 1986 federal income tax liability under 28 U.S.C. § 1334(b) "because, in a no-asset Chapter 7 case such as this, there are no assets to pay any tax claim and thus no bankruptcy purpose for a proceeding under 11 U.S.C. § 505."

On May 7, 2012, the Court ruled in conjunction with  "Plaintiff's Motion to Strike Declaration of Shelley Modahl and Motion in Limine," that "the amount of the debt owed the IRS is not an issue in this proceeding as no money judgment has been requested."  At the commencement of the trial, the Court modified that ruling, stating that reference to the amount of the debt would be permissible to the extent it was germane to the willfulness of the Debtor's belief or conduct resulting from his understanding of the amount he owes the IRS.  Additionally, before the trial began, the IRS through counsel indicated that it did not intend to submit evidence regarding the filing of a fraudulent return by the Debtor. Thus, the sole issue in this proceeding is whether the IRS sustained its burden of establishing that the Debtor "willfully attempted in any matter to evade or defeat" any tax owed.  *See*  11 U.S.C. § 523(a)(1)(C).

Prior to trial, the parties filed a Joint Pretrial Memorandum, setting forth facts which were admitted and required no proof.  Based upon the stipulated facts, the testimony, and documentary evidence, the Court now makes its findings of fact and rulings of law in accordance with Fed. R. Bankr. P. 7052.

## II. FACTS

### A. Procedural Background

The Debtor filed a voluntary Chapter 7 petition on August 5, 2010. On Schedule A-Real Property, he listed a residence located at 455 Puritan Road, Swampscott, Massachusetts, which he owns with his spouse as tenants by the entirety.[3] He valued the property at $825,000 and disclosed that it was subject to liens held by National Grand Bank of Marblehead, Massachusetts (i.e., a $91,273.53 first mortgage and a $19,218.20 home equity loan) and by the IRS ($1.2 million).[4] On Schedule B-Personal Property, the Debtor disclosed various accounts, including 401(k) plans, as well as a 90% interest in Benny J Fisheries, a so-called "Subchapter S corporation,"a commercial, non-transferable lobster license and related permits, an interest in Neil Rossman, P.C. d/b/a Rossman and Rossman Partnership and a 50% ownership interest in the partnership, and a leased automobile. Rossman valued all assets listed on Schedule B at $234,173.45.

On Schedules I and J-Current Income and Expenses of Individual Debtor(s), the Debtor disclosed that his expenses exceeded his income, a result which would not be obtained if the expenses associated with Benny J Fisheries were excluded from Schedule J.

---

[3] At the time of trial the Debtor had moved from Puritan Road in Swampscott to 15 Oak Road, Swampscott. His spouse continues to reside at the Puritan Road property.

[4] On Schedule D, the Debtor indicated that the IRS lien was contingent, unliquidated and disputed.

On December 14, 2010, the Chapter 7 Trustee filed a Report of No Distribution. Prior to that date, the Debtor commenced the adversary proceeding which is now before the Court. The Court entered a discharge order on January 11, 2011 with respect to all dischargeable debts.

B. Factual Background

Rossman is an attorney and a partner in a small law firm, Rossman & Rossman located in Boston, Massachusetts. He graduated from Wesleyan University and attended Boston University School of Law. In addition he served in the Army, was employed as a career firefighter to finance his law school education, taught school, and worked as a police officer. He is the father of three children.

Rossman testified that he performs a wide variety of legal work for a wide variety of clients. He served as lead counsel in the Dalkon Shield multi-district litigation and has tried cases all over the country for firefighters killed or injured in the line of duty. Rossman's income is primarily from his earnings as an attorney.

In 1985, one year before the onset of the investments which precipitated the current dispute with the IRS, Rossman recovered a $5 million dollar judgment in a case which rested on proof that fire engines were defectively designed and presented an unreasonable hazard to the firefighters who used them. According to the Debtor, the case resulted in a change to the design of fire engines. In conjunction with the action, Rossman received a substantial fee of approximately $900,000, a sum which dwarfed his previous, typical income of approximately $100,000 per year.

C. Rancho Madera Partners and Vista Ag-Realty Partners

Because of Rossman's success in obtaining a large judgment for firefighters, he was solicited by a financial planner, identified as Mr. Robillard ("Robillard"), with whom he shared office space. Robillard presented him with materials regarding investments in two partnerships, Rancho Madera Partners and Vista Ag-Realty Partners, both of which were promoted and operated by American Agri-Corp ("AMCOR"). The marketing materials set forth significant tax benefits for investments in the partnerships, namely a 220% write-off in 1986 for a minimum 30-unit subscription for Rancho Madera Partners, and a 200% write-off in 1986 for a 35-unit subscription for Vista Ag-Realty Partners. Prior to making any investments in the partnerships, Rossman consulted with his accountant, Paul Johnson ("Johnson"), a certified public accountant. Following his discussions with Robillard and Johnson, Rossman, in 1986, invested $200,000 in Rancho Madera Partners and $100,000 in Vista Ag-Realty Partners.

The Debtor explained his understanding of the investments:

> The plan was that the land was being used – essentially it was being held and it was being used to raise crops and specifically grapes and other crops and with the idea that the land ultimately would be developed for shopping centers or shopping malls or sold to a developer who would use it for some other purpose and that there would be a large profit at the end.

> ***

> I understood that the money that I could buy into these two -- make these two investments with the same money that I would pay for taxes; in other words, the net amount to me was the same.

> ***

6

> But then there was a -- would be additional taxes in future years which are outlined on this document as a result of the stream of income in -- presumably in future years when I would not have made anywhere near the amount of money that I made in 1986. So the attractiveness of this investment was that it was going to pay me back money in future years when presumably I would not be making -- obviously not be making the money that I made in 1986 in a one-time windfall.

Indeed, hand written figures in the margins of the brochures describing the investments highlighted the cash distributions the Debtor expected to receive in the short-term from his investments in the two partnerships, which would then, in his view, be followed by substantial profit when the real estate owned by the partnerships was sold. Specifically, the Debtor expected to receive $42,000 from Rancho Madera Partners between 1987 and 1993 and $165,000 from Vista Ag-Realty Partners between 1989 and 1991, although those sums were insufficient to pay back the share purchase prices.

When asked on cross-examination whether the partnerships were tax shelters, Rossman responded that he had purchased the partnership units as investments, adding

> [t]he write off was meaningless to me because I had - - the net effect on my taxes was $300,000. So I would either have paid the $300,000 [for the investment] - - had I not made the investment, I would have paid $300,000 more in taxes. I would have written the check; I had the money. I made this investment with the same $300,000 that I would have paid had I not made the investment. I had the same amount of money in the checkbook when I made the investment I had the same amount of money left as I would . . . have had if I had paid the tax. So there was no financial advantage to me to buy this investment except for the purposes of receiving the money that was projected to be received down the road.

Rossman testified that in the years following his investments, he received "[v]ery upbeat, very happy news," adding that "these investments were making money, that the

crops were succeeding, . . . the vineyard was a great success and that things were moving

along and the -- these two investments were increasing and they were moving ahead with

plans to do the development for the shopping centers and the shopping malls."

According to the parties in their Joint Pretrial Memorandum, on or about September

14, 1987, Rossman filed his 1986 federal income tax return under the status of married filing

separately.[5] On his 1986 federal income tax return, which was prepared by the accounting

firm of Cary & Johnson, Rossman reported wage income of $818,579, interest income of

$8,757, non-excluded dividend income of $21,333, a capital loss of $1,500, and a $658,351

loss from "Rents, royalties, partnerships, estates, trusts, etc." The $658,351 reported loss

from "Rents, royalties, partnerships, estates, trusts, etc." is described on Schedule E of

Rossman's 1986 federal income tax return. The claimed loss consisted almost entirely of a

$440,000  loss from Rancho Madera Partners and a $199,543 loss from Vista Ag-Realty

Partners. The claimed partnership losses for Rancho Madera Partners and Vista Ag-Realty

Partners reduced the amount of total income that Rossman reported on his 1986 federal

income tax return to $188,818 and his reported tax to $33,573.  The $33,573 in tax reported

on Rossman's 1986 federal income tax return was 4.1% of the $818,579 in wage income

reported on the return.  Because of a $33,074 withholding credit, Rossman reported $499

in tax due on his 1986 federal income tax return

In late November or early December of 1989, the Debtor received correspondence

---

[5]  Rossman testified that he was divorced from his first wife in 1985.  The Court
presumes that testimony was mistaken and that the divorce was not final until after the
return was prepared.

from the "Amcor Limited Partners IRS Audit Committee."   The Committee in its

Memorandum with respect to "Funding of Defense Costs to Protect Against Disallowance

of Deduction," advised him and other investors that "[t]he IRS is conducting a criminal and

civil tax investigation focused on the short term farming activities and first year deductions

taken by the AMCOR sponsored partnerships."

The parities also agreed in their Joint Pretrial Memorandum that in March of 1990

the IRS issued Notices of Final Partnership Administrative Adjustment ("FPAA") for the

1986 partnership income tax returns of Rancho Madera Partners and Vista Ag-Realty

Partners. The IRS through the FPAAs disallowed the losses that both partnerships had

claimed on their returns.  Additionally, the parties agreed that by letter dated April 5, 1990,

Fred H. Behrens ("Behrens"), the partner in charge of tax matters for several AMCOR

partnerships, provided the limited partners, including Rossman, with copies of the FPAAs

disallowing the 1986 partnership losses that Rancho Madera Partners and Vista Ag-Realty

Partners had claimed on their income tax returns.

Behrens, as the tax matters partner of Rancho Madera Partners and Vista Ag-Realty

Partners, contested the FPAAs by filing petitions in the United States Tax Court on June 13,

1990. The cases were captioned Rancho Madera Partners v. Comm'r, Docket No. 12536-90,

and Vista Ag-Realty Partners v. Comm'r, Docket No. 12539-90.  The parties agreed in their

Joint Pretrial Memorandum that Rossman understood that, if the Rancho Madera Partners

and Vista Ag-Realty Partners Tax Court petitions were denied and the audit results upheld,

he and the other limited partners would owe additional federal income taxes for 1986 than

previously reported and paid.  Additionally, Rossman agreed that Behrens represented his interests in the Tax Court cases.  Although Rossman was solicited by the partnerships to contribute to defense costs, he did not participate in the litigation.

The Tax Court entered decisions in the Rancho Madera Partners and Vista Ag-Realty Partners cases on July 19, 2001, adjusting certain partnership items, resulting in the disallowance of approximately half of the losses reported on the partnership returns.  The decisions provided that the adjustments made to partnership income and expense "were attributable to transactions which lacked economic substance, as described in former I.R.C. § 6621(c)(3)(A)(v), resulting in a substantial distortion of income and expense, as described in I.R.C. § 6621(c)(3)(A)(iv), when computed under the partnership's cash receipt and disbursements method of accounting. . . ."  Section 6621(c)(3)(A)(v) of the Internal Revenue Code, which is cited in the text of the decisions, contains a definition of "tax motivated transactions" ("TMT") to include "any sham or fraudulent transaction."  Additionally, the Tax Court decisions were the result of a settlement agreement between the IRS and several AMCOR partnerships that was effected through the filing of a "Motion for Entry of Decisions Pursuant to Rule 248(b)."[6]  Under Tax Court procedural rules, Rossman was

---

[6] The terms of the settlement agreements in the Rancho Madera Partners and Vista Ag-Realty Partners cases required the partners to object or otherwise be  bound. The terms are contained in paragraph 2(j) of Attachment C to the "Motion for Entry of Decisions Pursuant to Rule 248(b)," and provide in part the following:

> Effective upon entry of the Decisions submitted herewith and such
> Decisions becoming final, and in consideration of the parties' consent to
> the assessment of interest at the rate prescribed by former I.R.C. § 6621(c),
> respondent [IRS] expressly waives all claims against the limited partners

considered a party to the partnership cases.  He testified that he believed that he was

bound by the decisions, although he stated he did not participate in the case.

    D. The Adjustment of Rossman's 1986 Income Tax Liability

    In their Joint Pretrial Memorandum, the parties agreed that the IRS notified

Rossman by letter dated October 8, 2002 that it had adjusted his personal 1986 federal

income tax liability as a result of the decisions in the Rancho Madera Partners and Vista

Ag-Realty Partners cases.[7]  Form 4549A, "Income Tax Examination Changes," which was

enclosed with the IRS's letter of October 8, 2002, shows that the IRS adjusted Rossman's

--------

      for any additions to tax that might be due under I.R.C. §§ 6653 and 6661 to
      the extent such claims for additions to tax are based upon the adjustment
      to partnership items set forth in the Decisions.

The reference in the settlement agreement to I.R.C. § 6653 is to the Internal Revenue
Code (26 U.S.C.) section codifying the civil fraud penalty, which is now codified at 26
U.S.C. § 6663.

    [7] The letter, which was signed by a "Tax Technician," provided:

      If you owe additional tax and/or penalties, we will send a billing notice
      including interest.  *The interest computation shown on the enclosed report is an*
      *estimate.*  It does not reflect any credits or payments.  When the additional
      tax has been added to your account, you will receive a correct billing.  You
      may want to pay the amount shown on our report, as interest will
      continue to accrue on any unpaid balance.  If you are due a refund, it will
      be sent to you.

      According to the settlement agreement, Internal Revenue Code Section
      6621(c), interest at 120 percent of the normal rate applies to the
      partnership adjustment.

(emphasis supplied).

1986 income by adding $226,413.00 in income relating to Rancho Madera Partners and

$88,409.00 in income relating to Vista Ag-Realty Partners, resulting in an additional tax

amount due of $157,132.00, plus IRC § 6601 interest in the amount of $658,607.89 computed

to "11/07/2002" November 7, 2002, and TMT interest computed to "1/07/2002 [sic]" in the

sum of $195,796.61.  According to Form 4549A, the total amount due was $815,739.89.[8]

Approximately two months before he received correspondence from the IRS,

Behrens, in an August 21, 2002 memorandum, outlined options available to limited

partners in receipt of, in his words, "obscene interest assessments," particularly where the

decision to settle "was the much-awaited passage of the 1998 tax law, which gave the IRS

full authority to mitigate runaway interest in these old, delayed cases" and where,

according to Behrens, "[i]n what can only be characterized as a malicious and intentional

emasculation of the law the IRS has chosen to ignore the will of Congress."   Behrens

---

[8] The "Amount due " of $815,739.89 set forth on  Form 4549A (Plaintiff's Exhibit
24) reflects the addition of $157,132.00 and $658,607.89; it does not include the TMT
Interest of $195,796.61.  Had the amount of TMT interest been added, the total amount
due would be $1,011,536.50.  In addition, the Debtor received correspondence from
Behrens referencing Form 4549A.  In a memorandum dated June 16, 2002, he stated:

> Although in some cases the settlement numbers seem unreasonable,
> please note the following:  (1) **Recapture Income** has been credited, as the
> net settlement number (the amount disallowed and added to your original
> year taxable income) has been reduced by the present value of all the
> partnership income that you reported in subsequent years, and (2)
> **Interest Netting** has been factored into the calculation of interest due.

> From the date of the actual tax (and interest) bill, you generally have a 21-
> day, interest free, grace period.  As we have no issue with the actual tax
> amount due (assuming the calculation is correct), we encourage the tax
> amount to be paid as soon is practicable.

referenced the following options available to the limited partners: 1) Offer in Compromise (Based on Equitable Relief); 2) Offer in Compromise (Based on Lack of Collectibility); 3) Interest Abatement; 4) Innocent Spouse; and 5) Bankruptcy.  In a "Reply Form" attached to the August 21, 2002 memorandum, Rossman, on October 7, 2002, as part of a request for additional information about his eligibility for an offer in compromise, indicated that his IRS liability exceeded his net worth and that he was considering filing a bankruptcy petition.

When asked on cross-examination if he followed the advice proffered by Behrens, Rossman stated that it was "financially impossible" for him to pay the tax, let alone the interest which he discovered on October of 2002 would amount to $658,607.89 pursuant to IRC § 6601 and $195,796.61 for TMT interest, in addition to the additional tax amount due of $157,132.00.

The Debtor subsequently received additional communications from the IRS pertaining to his account.  On May 12, 2003, he received a notice that he owed $338,897.06, including interest, calculated as follows:

Account balance before this change $810,393.48
Decrease in tax because of this change ($13,207.00)
Additional late penalty since prior change $5,037.37
Decrease in Interest previously charged ($463,326.79)
Amount you now owe $338,897.06

The Debtor received no explanation with respect to the computation.  Several months later, on July 14, 2003, he received a similar notice, again without an explanation, indicating that he owed $235,836.31 because of a reduction in the late payment penalty previously

charged.[9]  Then, on September 15, 2003, the IRS issued "CP 504" Notice, advising Rossman

of the IRS' intention to levy his assets, which reflected a penalty of $658.88 [sic], but no

current balance.  The Debtor testified that those documents, plus the Notice of Federal Tax

Lien, discussed below, were the only documents which set forth the amount of the debt

owed the IRS.

        The IRS, in its cross-examination of the Debtor, sought to explain the discrepancies

in the amount owed by pointing to a "Brief in Support of § 6621(c) Penalty Interest Defense

and § 6404(e) Interest Abatement" filed on the Rossman's behalf in the Collection Due

Process ("CDP") hearing he requested on October 12, 2004.  In that brief, his attorney noted

that when Rossman was initially sent a Form 4549A (Income Tax Examination Changes)

in October of 2002 the Tax Court decision in the Rancho Medera Partners case was not final

because of a pending motion to vacate.  In other words, the the assessment of penalty

interest was not final.[10]  The decision in that case did not become final until sometime in

---

[9] This new figure was computed as follows:

Account balance before this change $338,897.06
Decrease in tax because of this change ($100,000.00)
The late payment penalty that was previously charged has been reduced
($3,060.75)
Amount you now owe $235,836.31

[10] The IRS also pointed to a statement made by Behrens in his June 17, 2002
memorandum that "Redding's actions on behalf of one limited partner has effectively
stalled our settlement for two partnerships . . . ."  Thomas E. Redding is Rossman's tax
attorney.

2003.[11]

On October 21, 2003, Rossman submitted a claim for a refund to the IRS with regard

to the 1995 federal income tax year in the amount of $27,999. Specifically, he requested that

that sum be offset against his 1986 federal income tax liability. By letter dated June 3, 2005,

the IRS informed Rossman that the claim for a refund had been disallowed and that he

could file suit in U.S. District Court if he wished to challenge that result.[12]

On June 18, 2004, the IRS issued another Form 4549A. That form reflected an

increase in the Debtor's 1986 taxable income with respect to Rancho Madera Partners by

$226,413.00 , the same amount as set forth in the October 8, 2002 Form 4549A, for a total tax

due of $113,206.30, without setting forth any penalties, § 6601 interest or TMT interest. The

IRS sent this Form 4549A to the Debtor after the Rancho Madera Partners Tax Court

decision was final. The IRS did not include an explanation with the 2004 Form 4549A.

E.  Administrative Proceedings Initiated by Rossman

On September 15, 2004, the IRS issued a Final Notice of Intent to Levy with respect

to the 1986 income tax year, and, on September 16, 2004, it filed a Notice of Federal Tax

Lien in the Southern Essex District Registry of Deeds in the amount of $764,701.77. The

parties agreed that in response to the Final Notice of Intent to Levy, Rossman, on October

---

[11] The last docket entry in Case No. 12356-90 is June 10, 2003. The Brief filed in
the CDP matter references a September 8, 2003 date.

[12] On June 4, 2007, Rossman filed a lawsuit, Rossman v. United States, Case No.
1:07-cv-346-LB, in the United States Court of Federal Claims, seeking a judgment that he
was entitled to the $27,999 refund for the 1995 income tax year. He voluntarily
dismissed this suit on June 22, 2011.

12, 2004, requested a CDP hearing, identifying four issues: (1) whether he was entitled to an abatement of the tax-motivated interest that the IRS had assessed against him pursuant to former I.R.C. § 6621(c); (2) whether he was entitled to an abatement of interest pursuant to 26 U.S.C. § 6404(e) between 1989 and 1993; (3) whether his claim for refund for the 1985 federal income tax year[13] should be granted with the refund amount applied toward his 1986 federal income tax liability; and, (4) whether the IRS would accept an offer in compromise.

Over two and one-half years after Rossman requested a CDP hearing, the IRS sent him a Notice of Determination dated May 10, 2007, informing him that the relief that he had requested in his CDP hearing had been denied and that his remedy was to file a petition with the United States Tax Court within 30 days.  In the Notice of Determination, the Appeal Team Manager, Julia D. Whited, stated:

> Appeals has verified that all applicable laws and procedures have been followed in your case.  The issuance of the Final Notice of Intent to levy is appropriate in your case. . . .
>
> Appeals has determined that you are not permitted to challenge the liability in this CDP proceeding as you had prior opportunity to challenge the liability as defined in IRC sections 6320 and 6330(c)(2)(B).  The liability (including the 6621(c) addition to tax) was determined via the entry of a decision in a TEFRA Partnership case (AMCOR).  You did not avail yourself to any of the opportunities you had after the decision was entered to challenge the decision.  Appeals has no authority to change/alter/modify or otherwise adjust a final decision of the tax court. . . .

With regard to the fourth issue, whether the IRS would consider an offer in compromise,

---

[13] The parties recognized that the year 1985 appears to have been a typographical error, as Rossman intended to request a refund for the 1995 income tax year.

the IRS denied the relief because Rossman had indicated that he had made the

determination not to proceed with an offer in compromise at that time.

In the meantime, the Debtor attempted to refinance his home located on Puritan

Road, which he and his spouse had purchased in 1993 as tenants by the entirety for

$535,000.[14]  They had financed the purchase with a mortgage  from the National Grand

Bank of Marblehead.  In January of 2007, the Debtor and his spouse completed a Uniform

Residential Loan Application to obtain a $600,000 loan to refinance the existing mortgages

on the Puritan Road property for the purpose of satisfying the federal tax lien which was

recorded in September of 2004.  They submitted applications to the National Grand Bank

of Marblehead and to the Ipswich Cooperative Bank.  On March 19, 2007, the Ipswich

Cooperative Bank denied the request for a $600,000 loan because the amount of the tax lien

was in excess of $700,000 and there was no agreement to subordinate.  The Debtor testified

that he did not personally submit a request to the IRS to subordinate its lien, but  a loan

officer at the National Grand Bank was active on his behalf.

At the time the Debtor was attempting to refinance his home, his tax attorney,

Thomas E. Redding ("Redding") with the firm of Redding & Associates, located in Houston

Texas, sent a letter, dated March 8, 2007, to Ms. Elizabeth M. Johnson ("Johnson"), an IRS

Appeals Officer in Houston.  In addition to advising Johnson that Rossman intended to

defer submitting an offer in compromise until resolution of a potential appeal, Redding

---

[14] The Debtor testified to this amount.  The loan application set forth an amount
of $545,000. The difference in the amount is not material.

stated:

> Mr. Rossman further proposes to begin making $5,000 per month installment payments on his liability.  He is endeavoring to raise additional funds to make a substantial cash payment in addition to the $5,000 per month installments.  This has become more difficult than originally contemplated because of having to resolve issue regarding the marital rights of his spouse.  Please advise whether the $5,000 payment should be made directly to you or tendered by him as partial payments on the liability as we proceed.

Rossman testified that he did not receive a reply from the IRS to his offer to make monthly payments of $5,000 and that, although he had anticipated obtaining loans in the range $325,000 to $350,000 to pay the IRS, his loan applications were rejected.  The Appeals Officer, however, did reply to Redding on April 11, 2007.  She stated that if the Debtor wished to make monthly payments he should send them to the IRS center at which he filed his returns with a cover letter identifying the tax year and how the payments were to be applied.

Rossman admitted that he never made any $5,000 payments stating that he could not get the funds necessary to ensure that he could honor the agreement.  He explained:

> . . . I was going to make a substantial down payment with part of the refinancing money and I was going to have a reserve of money to ensure that I could meet my obligations each month to make the -- to honor the $5,000-a-month installment plan because it was pointed out to me that once you enter into an installment plan or an installment payment you have to honor it and if you deviate from it or miss a payment the IRS will cancel the agreement.  So I needed to have a fund of money that could ensure that if I was short in my cash flow each month that I could honor the agreement that I was about to enter into.

Rossman testified that although two banks agreed to refinance the Puritan Road property, the transaction was not consummated because the IRS would not agree to subordinate its

lien.

The parties agreed in their Joint Pretrial Memorandum that on June 13, 2007, Rossman filed a "Petition for Lien and Levy Action Under § 6330(d)(1)(A) and for Review of Failure to Abate Interest Under Code Section 6404" with the United States Tax Court, namely, Rossman v. Comm'r., Case No. 13515-07L. Through his petition in the Tax Court, Rossman requested "a redetermination of the Commissioner's determinations in his Collection Due Process Hearing." In his prayer for relief, he requested that the Tax Court abate the former § 6621(c) penalty interest assessed against him with regard to his 1986 federal income tax liability, abate all interest assessed against him with regard to his 1986 federal income tax liability "from March 19, 1989 to April 1, 1993 under § 6404(e)," and allow his 1995 claim for refund as an offset against his 1986 federal income tax liability.

Rossman testified that the purpose of the suit was to provide him relief with respect to the following:

> approximately three-quarters of a million dollars in interest and penalty that have been assessed against whatever tax I might owe because through no fault of my own it took 11 and 13 years for the decision to be made on the original 1986 tax returns and so it's looking to challenge the penalty interest and interest that has continued to accrue on whatever original tax I might have owed.

On cross-examination, Rossman testified that although he was aware of the issues in the pending case, he was not familiar with the arguments raised by Redding or the IRS. He did not challenge the  increase in the actual amount of tax due for his 1986 federal income tax, which was assessed against him based upon the Tax Court decisions in the Rancho Madera

19

Partners and Vista Ag-Realty Partners cases  or the imposition of interest at the standard

underpayment rate for any period of time outside of 1989-1993.

The IRS filed an answer in the Debtor's Tax Court case.  In March 2008, Rossman

and the IRS filed a "Stipulation to be Bound with Respect to Section 6621(c) Issue" in which

the parties recognized that the issue of whether Rossman is liable for interest computed

using the increased rate of interest for substantial underpayments attributable to tax-

motivated transactions under former I.R.C. § 6621(c) for the tax year 1986 is the same issue

submitted to the Tax Court in cross motions for summary judgment filed in the case of

Houston v. Comm'r, No. 001445-06, and that a final decision in that case would bind

Rossman and the IRS in Rossman's case.  At the commencement of his bankruptcy case and

at the time of the filing of the Joint Pretrial Memorandum, Rossman's Tax Court petition

was pending, as is the Tax Court matter Houston v. Comm'r.  Indeed, the matter has been

under advisement for over five years as the last docket entry in the Houston case was on

August 20, 2007.

F. Rossman's Income

As noted above the Debtor receives the bulk of his income from his law practice.

During the period from 2001 to 2010 inclusive, the Debtor's law firm, Rossman & Rossman

made distributions to Neil Rossman, P.C, which in turn, paid compensation to its officers.

Rossman reported that compensation as wage income on Form 1040s which he filed jointly

with his wife. Although plaintiff's wife had some wage income during this period, her

wage income was substantially less than Rossman's income and did not earn any wage

income between 2004 and 2009 when she cared for her mother who lived with the family.

The tax returns show the following:

| Year | Partnership Distribution | Compensation of Officers | Wage Income | Fed. Tax Paid |
|------|------|------|------|------|
| 2001 | $243,825 | $230,000 | $230,000 | $48,311 |
| 2002 | $139,176 | $100,000 | $99,764 | $12,700 |
| 2003 | $149,730 | $120,000 | $194,491 | $24,161 |
| 2004 | $1,692,052 | $1,620,000 | $1,670,862 | $549,630 |
| 2005 | $646,995 | $660,000 | $650,342 | $176,364 |
| 2006 | $318,214 | $265,000 | $245,000 | $42,682 |
| 2007 | $316,879 | $240,000 | $220,700 | $29,850 |
| 2008 | $126,479 | $176,000 | $177,000 | $11,887 |
| 2009 | $327,097 | $170,000 | $170,000 | $17,759 |
| 2010 | $220,824 | $170,000 | $172,879 | $6,731 |
| Total | $4,181,271 | $3,751,000 | $3,831,038 | $920,145 |

The Debtor also receives income from a pension from the Town of Swampscott. The amount of the pension currently is approximately $17,000 per year and has increased from $14,000 per year over the past decade.

G. The Debtor's Lifestyle

As noted above, Rossman has three children. His daughter attended the University of Vermont, graduating in 2003 between the time Rossman received the October 8, 2002 Form 4549A and the September 16, 2004 Notice of Federal Tax Lien. Rossman paid a substantial part of her tuition, although she also received scholarships.[15] One of Rossman's

---

[15] In their Joint Pretrial Memorandum, the parties agreed that Rossman paid the full amount of his daughter's out-of-state tuition and fees at the University of Vermont from September 1999 through May 2003 and that according to public records, the cost of out-of-state tuition and fees during those four academic years was $19,252, $19,832, $20,725, and $21,484, totaling $81,293 over the four years. In addition to paying tuition and fees, he provided his daughter, who lived off-campus, with money for rent and

two sons attended private school and he paid the tuition. Rossman testified that one of his sons has a learning disability and that he and his wife "thought in conjunction with his physicians and psychologists that he would benefit from the atmosphere of a private school as opposed to public school." Because of scholarships, the tuition for the Debtor's son has been reduced from over $20,000 to approximately $4,000.[16] Rossman testified that the tuition reduction was attributable to his deteriorating financial situation.

Rossman testified that he has taken two vacations to Antigua since 1990 - - vacations which he paid for using after-tax winnings from lottery tickets in the sum of approximately $7,700. Rossman stated that the first vacation was "the first family vacation we ever took and my son enjoyed it so much that with the remaining money from that scratch ticket winning we went back a second year, two years later." Each family vacation cost about $3,500.

The parties recognized in their Joint Pretrial Memorandum that Rossman reported gambling income and losses on his federal income tax returns. At no time between 2001 and 2010 did his gambling income exceed $11,000 and generally Rossman reported income between $0 or $1,000 from gambling. Except for the years 2002, 2004 and 2009, Rossman did not report gambling losses. In 2002, 2004 and 2009, he reported gambling losses of $1,000, $7,012 and $1,000, respectively.

---

food.

[16] The parties agreed in their Joint Pretrial Memorandum that between the 2006-07 school year and the 2011-12 school year, the Debtor paid $86,760 for his son's private school education.

Additionally, the parties agreed that Rossman had been a member of the Boston Yacht Club, paying annual dues of approximately $900, until 2009.  They also agreed that the Debtor used his membership privileges primarily to entertain his business clients.

Rossman testified that he paid for his daughter's wedding, which cost approximately $29,000.  To obtain the funds he sold an antique car and a Harley-Davidson motorcycle in 2009.  There was no evidence as to when he acquired those assets.

Rossman indicated that he owned or leased vehicles between 1986 and 2010 but they were for the purposes of getting to work and conducting his business as a lawyer.  In 2008, he executed a lease for an Infinity M35X automobile, for which he was required to make monthly payments of $582.88.  The value of the vehicle at the commencement of the lease was approximately $44,000.  He is no longer leasing that vehicle.  He now leases a Hyundai for $355 per month.  At one time he owned a Nissan Maxima and borrowed $25,000 to purchase that vehicle.  Together with his spouse, he also obtained a loan to purchase a 2007 Chrysler Town and Country Touring van for approximately $33,000, a loan which required monthly payments of $318.93.  He explained that the family needed the van to transport his physically handicapped son and his elderly and ailing mother-in-law to various medical appointments.

H. The Debtor's Investments and Other Assets

Rossman indicated that he had two investment accounts at Fidelity, both for the benefit of his son, one of which was attributable to gifts from family members.  He testified he liquidated that account to pay his son's tuition.  Rossman stated that the second Fidelity

account was a U Fund Massachusetts 529 College Savings Plan, which was for his son's college education. Rossman testified that he also had a 401(k) plan with an existing balance of approximately $45,000 and that he had been forced to borrow against it to pay his 2011 taxes. He also has a retirement plan through his law practice with a balance of approximately $84,000.

In addition, Rossman at one time had an account with E*Trade Securities, LLC, with an account number ending in 873. In May of 2007, it had a value of $207,168.92. The Debtor testified that he used monies in the account to pay living expenses, as well as extraordinary legal expenses. He has another retirement account with the same entity, with an account number ending in 570. In 2009, that account had a value of $48,437.83. Rossman testified that the account was 20-25 years old and that he no longer funds it. He estimated that it had a value betwwen $40,000 and $45,000 at the time of trial.

Rossman invested in other businesses over the years. He invested in a leasehold for a skating rink but that rink produces only phantom income for which he has paid taxes but received no cash benefit. Rossman also owned a condominium with his brother. The brothers purchased the condominium for their father who passed away in 2003. They sold the unit in 2004, satisfied the mortgage, and divided the profit. After satisfying the mortgage, Rossman testified he realized net proceeds of approximately $70,000. On Schedule 4797 of his federal income tax return for 2004, he reported a total gain of $143,945. He explained the difference between the total gain and $70,000 was the result of capital gain tax.

With respect to Rancho Madera Partners and Vista Ag-Realty Partners, the Debtor testified that he reports income from his limited partnership interests, which he does not actually receive, and pays taxes with respect to that so-called phantom income at the rate of 40%. For the years between 1987 and 1995 inclusive, that income totaled $246,700. The IRS, however, in examining Schedule E attached to his Form 1040s for reporting partnership income and losses, established that the Debtor offset his income from Rancho Madera Partners and Vista Ag-Realty Partners against losses from two other partnerships, namely ATR Historic Associates and Ohio Development Fund.

Rossman testified that he paid all federal income taxes owed between 1986 and 2010 other than the taxes, interest and penalties attributable to Rancho Madera Partners and Vista Ag-Realty Partners accruing from the 1986 tax year when he filed his bankruptcy petition. Indeed, between 1986 and 2010, the Debtor, who testified that he paid his federal tax obligations in full, and on time, paid a total of $1,761,527 in federal income taxes and a total of $400,876 in state taxes.[17] In addition to paying taxes, the Debtor indicated that the IRS had withheld tax refunds to which he claimed entitlement of over $76,000. He added that he was unaware of whether the IRS credited all refunds it seized to his outstanding tax liabilities.

I. The Debtor's Lobster Fishing Business

Rossman also testified that he is the principal of a lobster fishing business, Benny

---

[17] Revised Plaintiff's Exhibit 20, reflects that the Debtor was unable to state the amount of federal and state he paid 2000.

J Fisheries Limited.  Because Rossman is the sole owner of the business (at one time there

was another 10% stakeholder), he did not differentiate between himself and his corporation

in his testimony.  He indicated that he started to "run his own boat" in 1999.  That boat was

a 26-foot fishing boat purchased for $12,000.   Under his existing license from the

Massachusetts Division of Marine Fisheries, he is entitled to set a maximum of 800 lobster

traps.  Rossman indicated that he does not conduct his business either full time or year

round.   Rather, he fishes from April through Thanksgiving or through December

depending on weather and then only on weekends, holidays, vacations, and one morning

per week.  The Debtor, whose passion for and devotion to the lobster business was evident,

explained that he continued in the business despite its downturn because he wanted to

have something that he could fall back on  when he retired from the practice of law.

Rossman also testified about the money he invested in the lobster business.  He

indicated that he sold his first boat in 2000 and purchased another boat for approximately

$100,000, using funds he obtained from the sale of his existing lobster boat and a sailboat.

He later acquired a second lobster boat and hired a crew to run the second boat, which he

operated for approximately ten years until he sold that boat.

Benny J Fisheries Limited also owned two buildings which it used to conduct its

lobster business.  The first building was located on Florence Street in Salem, Massachusetts,

and the second was located on Meadow Street in Salem.  Benny J Fisheries Limited  used

the buildings to store and repair traps, buoys and other equipment.  Rossman caused the

corporation to finance the acquisition of the first building which was purchased for

$575,000.  The corporation owned the building for six years and exchanged it for a smaller

building.  As president and treasurer, he executed an adjustable rate note in the sum of

$110,000, as well as a mortgage and a guaranty with respect to the Meadow Street property

on July 28, 2011.

Rossman testified about the economic decline of the lobster business beginning with

the terrorist attacks of September 11, 2001.  He explained that the decline in the cruise

industry, which purchased 160,000 pounds of lobster per week, as well as cutbacks in

shipments to Europe, contributed to hardships experienced by those involved in the lobster

business.  The economic recession beginning in 2008, the increased costs of diesel fuel and

bait, and the reduction in the retail price of lobster then added to the industry's problems,

throwing "the lobster into a tailspin."  Rossman admitted that Benny J Fisheries did not

report any taxable income for the years 2001 thorough 2010. He reported the value of his

ownership interest in the business as $-0- on Schedule B and took tax losses every year as

a result of depreciation of equipment and the buildings out of which it operated.

J. Lack of Concealment of Assets or Income

Rossman testified that he has not transferred assets to conceal them from tax

collection; has not transferred assets to any trusts; had not created any corporations to

siphon assets; has no nominee accounts for depositing money; has taken no steps to shelter

or segregate any assets so that they could not be reached for the payment of taxes; and has

no offshore accounts.  He stated:  "The only accounts that I have are the ones that have

been disclosed to the Government in this case and that have been reflected on my tax

27

return -- returns over the years."

K. <u>The Testimony of Donald Guild</u>

Donald Guild ("Guild"), a 28-year employee at the IRS testified at trial.  By way of background, he explained that he has served for the past nine years as a revenue officer and technical advisor and has been in charge of the administration of the Summons Enforcement Program for the six New England states.  Previously, he was assigned to the Offer in Compromise group.  Guild testified that the IRS has no record of any request from the Debtor to subordinate its lien on the Puritan Road property to facilitate a refinancing of  his home or a record of the March 8, 2007 letter from Redding to Johnson referencing Rossman's offer to make monthly payments of $5,000 in addition to "a substantial cash payment."  Guild, however, testified that the IRS did not keep requests for installment agreements, stating: "We don't have a file or any record keeping for installment agreement requests. What is available is a transaction code on the taxpayer's account which would indicate that he did, in fact, request an installment agreement."  He added that there was no transaction code on Rossman's account with respect to the proposed installment payments.

On cross-examination, Guild admitted that occasionally the IRS's files were incomplete, missing, or could not be located.  In particular, he admitted that he did not find in Rossman's file the letter dated Mach 8, 2007, which Redding sent to Johnson referencing Rossman's proposal to make monthly payments.  Guild stated that such a letter was unlikely to be part of a taxpayer's fie although he stated that such letters are an acceptable

method to request subordinations and installment agreements, and a transaction code for

such a request existed.  In addition, Guild testified that he did not find in Rossman's file

a record of the Notice of Federal Tax Lien dated September 16, 2004.

L. <u>The Amount of the Debt</u>

Although the actual amount the Debtor owes the IRS is not an issue in this case, the

Court ruled that Rossman's understanding of the amount he owes is relevant to a

determination of dischargeability.  Rossman testified unequivocally that he had no idea of

the total amount he actually owes the IRS.  He stated:

> . . . I don't know what I owe, but because there have been so many
> contradictory documents that have been produced in this litigation, but most
> importantly was the IRS transcript that you produced at my deposition that
> showed a number in the amount of $700,000 and that was supposed to be a
> current document. And when I was present when 30(b)(6) deposition was
> taken of the IRS representative and he couldn't tell Mr. Davis how much
> money I owed as of the time that he was sitting there having his deposition
> taken, so there have been so many contradictory documents and forms. As
> an example, I got a -- one of the exhibits in this case is the Form 45, whatever
> it was, that was sent to me in June of 2004 that said that I owed some amount
> of money, I think 100- and-something thousand dollars and 60 days later
> there was a lien placed on my house for 750 -- $760,000, so I don't know – I
> have no idea what I owe. I have never had a firm figure given to me as to
> what I owe at any particular point in time on behalf of the IRS. And even if
> I could get that kind of a number, part of that number is on appeal in the Tax
> Court.

The IRS, over the years, has applied overpayment credits to Rossman's outstanding

tax obligations.  Between 1991 and 2008 it applied $76,451.92, but Rossman testified that

he was not sanguine that other overpayments had been applied.  The schedule of

overpayments totaling $76,451.92 does not include two entries reflected on the 1986

Transcript, namely $5,404 for a prior tax abated and $3,060.75 as another credit.

Rossman designated portions of the Rule 30(b)(6) deposition testimony of Gerald

Miller ("Miller"), an attorney with the Tax Division of the Department of Justice.  He was

unable to explain the reason why a credit entry in the 1986 Transcript was made for a

reduced or deleted interest charge in the amount of $463,326.79, a prior tax abated of

$13,207, or another abatement of $100,000.   Additionally, that transcript contained the

reduction or removal of a penalty for late payment of tax of $3,060.75, which Miller was

unable to explain. Miller also was unable to explain an entry on the 1986 Transcript for an

interest charge for a late payment in the amount of $462,503.67.

## III. DISCUSSION

A. <u>Applicable Law</u>

Section 523(a)(1)(C) provides:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title
does not discharge an individual debtor from any debt--

(1) for a tax or a customs duty--  . . .

   (C) with respect to which the debtor made a fraudulent return
   or willfully attempted in any manner to evade or defeat such
   tax . . . .

11 U.S.C. § 523(a)(1)(C).  In <u>Bryen v. United States (In re Bryen)</u>, 433 B.R. 503 (Bankr. E.D.

Pa. 2010), *aff'd*, No. 10-CV-5030, 2011 WL 6092340 (E.D. Pa. 2011), *aff'd,*  449 Fed. App'x 165

(3d Cir. 2011), the court stated the following with respect to the burden of proof applicable

to complaints under § 523(a)(1)(C):

> As is true with respect to most other § 523(a) discharge exceptions, § 523(a)(1)(C) is strictly construed in favor of the debtor. In re Fegeley, 118 F.3d 979, 983 (3d Cir.1997) (citing Dalton v. I.R.S., 77 F.3d 1297, 1300 (10th Cir.1996)). At the same time, however, as the Court of Appeals observed in Fegeley, § 523(a)(1)(C) is drafted in broad terms. Conduct that "in any manner" constitutes an attempt to evade or defeat a tax renders the tax debt nondischargeable. See 118 F.3d at 983.
>
> The IRS bears the burden of proof on the issue of dischargeability, even though the Debtor is the plaintiff in this proceeding. Id. The IRS must prove by a preponderance of the evidence that the Debtor willfully attempted in any manner to defeat or evade his taxes. Id. (citing Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

In re Bryen, 433 B.R. at 515.  In United States  v. Beninati, 438 B.R. 755 (D. Mass. 2010), the court similarly observed that the statutory exception under § 523(a)(1)(C) requires that "the government must prove, by a preponderance of the evidence, that a particular claim is not dischargeable," adding that "[e]xceptions to the general rule of discharge are to be construed strictly in favor of the debtor." 438 B.R. at 758 (citing United States v. Fretz (In re Fretz), 244 F.3d 1323, 1327 (11th Cir. 2001)).

In In re Fegeley, the United States Court of Appeals for the Third Circuit determined that "'[t]he plain language of the second part of § 523(a)(1)(C) comprises both a conduct requirement (that the debtor sought 'in any manner to evade or defeat' his tax liability) and a mental state requirement (that the debtor did so 'willfully').'" 118 F.3d at 983 (citing Matter of Birkenstock, 87 F.3d 947, 951 (7th Cir. 1996).  See also In re Jones, 364 B.R. 118 (Bankr. M.D. Fl. 2007), aff'd, 381 B.R. 897 (M.D. Fla. 2008).  In Jones, the court explainted:

> [A] tax may be nondischargeable under the second prong of § 523(a)(1)(C) if the debtor willfully attempts in any manner to evade or defeat such tax.

31

Two elements of the statute must be satisfied for the tax debt to be nondischargeable. The attempt to evade or defeat the tax must be "willful," and the debtor must have engaged in "conduct" evidencing his attempt to evade or defeat the tax. In re O'Callaghan, 316 B.R. 550, 554 (Bankr. M.D. Fla. 2004).

To prove the "willful" element of the cause of action, the IRS must show that the debtor "(1) had a duty to file income tax returns and pay taxes; (2) knew he had such a duty; and (3) voluntarily and intentionally violated that duty." In re Fretz, 244 F.3d 1323, 1330 (11th Cir. 2001). Courts must often rely on circumstantial evidence, or badges of fraud, to determine whether a debtor intended to violate his duty to pay taxes. In re Cole, 328 B.R. 237, 241 (Bankr. M.D. Fla. 2005).

To prove the "conduct" element of the cause of action, the IRS must show that the debtor's nonpayment of a tax is coupled with "specific conduct evidencing his attempts to evade or defeat the payment." In re O'Callaghan, 316 B.R. at 555. The "conduct" requirement is satisfied "where a debtor engages in affirmative acts to avoid payment or collection of taxes." In re Fretz, 244 F.3d at 1328–29 (citing In re Haas, 48 F.3d 1153 (11th Cir.1995) and In re Griffith, 206 F.3d 1389 (11th Cir.2000)).

In re Jones, 364 B.R. at 125-26.

In Bryen, the court discussed factors that might elucidate a taxpayer's state of mind

for purposes of determining willfulness.  It stated:

A court may infer a taxpayer's state of mind from his or her conduct. _E.g.,_ Lacheen, 365 B.R. [475] at 483 [(Bankr. E.D. Pa. 2007)] ("Because a taxpayer is unlikely to admit an intentional evasion of his obligation to pay taxes, courts consider circumstantial evidence in determining willfulness."); _accord_ Guben, 2008 WL 3875354, at *4. It is unnecessary to show that the taxpayer had an evil motive or sinister purpose; it is sufficient to find that the conduct was voluntary and intentional. Scarpiello, 240 B.R. at 210.

In Lacheen, the court looked at several types of circumstantial evidence in evaluating the debtor's state of mind, including:

1. the debtor's conduct over a period of time, which may extend beyond the time when the tax payment was due;

2. any manipulative conduct of the voluntary tax system by failing to make estimated payments toward anticipated tax liabilities and failing to pay taxes due when concurrently seeking the automatic filing extension;

3. failure to make voluntary payments toward tax liabilities by submitting to employer withholding tax procedures;

4. the existence of disposable income during the relevant tax years and its depletion without reservation for payment of taxes when due;

5. routine practice of applying for extensions that are automatically granted; and

6. evidence that the tax payer had the financial resources to pay but simply did not.

365 B.R. at 484–86.

Bryen, 433 B.R. at 520. *See also* Waterman v. United States (In re Waterman), No. 10-01849, 2012 WL 2255002 at *5 n.7 (Bankr. S.D. Iowa June 15, 2012).

In Beninati, the court set forth a similar test, elucidating the requirements set forth in In re Fegeley. It stated:

The relevant statute contains a conduct and a mental state requirement. *See* 11 U.S.C. § 523(a)(1)(C); Steinkrauss v. United States, 313 B.R. 87, 96 (Bankr. D. Mass. 2004). To satisfy the conduct requirement, the government must prove "that the debtor engaged in affirmative acts to avoid payment or collection of the taxes." United States v. Jacobs, 490 F.3d 913, 920 (11th Cir.2007). The mental state requirement is met if the government demonstrates that the debtor 1) had a duty to pay taxes, 2) knew he had such a duty and 3) voluntarily and intentionally violated that duty. Id. (citing Fretz, 244 F.3d at 1330).

Conduct that constitutes circumstantial evidence of a debtor's willful intent to evade taxes includes: 1) implausible or inconsistent explanations of behavior, 2) inadequate financial records, 3) transfers of assets that greatly

reduce assets subject to IRS execution and 4) transfers made in the face of serious financial difficulties. United States v. Spiwak, 285 B.R. 744, 751 (S.D.Fla. 2002). Significant dealings in cash and maintaining an extravagant lifestyle can also serve as evidence of willful intent. *See* Hamm v. United States, 356 B.R. 263, 286 (Bankr. S.D.Fla. 2006) (where debtors spent extravagantly and frequently withdrew large sums of money from their bank accounts in the face of significant tax liabilities); United States v. Fegeley, 118 F.3d 979, 984 (3d Cir.1997) (where debtors made lavish expenditures while simultaneously failing to file tax returns or pay tax liabilities).

Beninati, 438 B.R. at 758.

B. Analysis

The record is devoid of any direct evidence of the Debtor's willful intent to evade taxes in the form of implausible or inconsistent explanations of behavior; inadequate financial records; transfers of assets that greatly reduce assets subject to IRS execution; and transfers made in the face of serious financial difficulties.  *See* Beninati, 438 B.R. at 758. Similarly, the Debtor did not engage in any manipulative conduct by failing to make estimated payments or failing to pay annual taxes after 1986 when due, and there was no evidence that he  routinely applied for extensions of time within which to file returns.  *See* Lacheen v. IRS (In re Lacheen), 365 B.R. 475, 484-86.  Indeed, the Debtor testified, and the IRS did not dispute, that, with the exception of his tax liabilities from Rancho Madera Partners and Vista Ag-Realty Partners,  Rossman paid all federal and state taxes on time and in full from 1987 to the commencement of his bankruptcy case.

Thus, in the instant case and except as discussed below, Rossman engaged in no conduct suggesting an intent to evade his 1986 tax obligations and most of the types of circumstantial evidence used to evaluate a debtor's state of mind for purposes of

34

willfulness are absent.  Nevertheless, in <u>Lacheen</u>, the court highlighted evidence of an

intent to evade the payment of taxes arising from circumstances where the taxpayer had

the financial resources or disposable income to pay but simply did not, as well as evidence

of a lavish lifestyle.  Those circumstances are at the heart of the IRS's contention that any

obligation owed to it by the Debtor should be nondischargeable.

The court in <u>Lacheen</u> stated:

> A further indicia of an intent to evade payment of taxes is drawn from evidence that the taxpayer had the financial resources to pay but simply did not.  In <u>Fegeley</u>, the Third Circuit observed that the taxpayer's failure to discharge his known duty to file returns along with his financial ability to discharge that duty were sufficient to prove a willful attempt to evade or defeat his taxes. 118 F.3d 979. Even where the returns are filed, the failure to pay the IRS because available income has been directed to other, often non-essential purchases is sufficient to preclude a discharge under § 523(a)(1)(C). *E.g.*, <u>In re Jacobs</u>, 2006 WL 2691516 at *13 ("lavish spending in the face of mounting tax debt also demonstrates conduct designed to evade or defeat a tax"); <u>Hassan v. United States</u>, 301 B.R. 614, 622–24 (S.D. Fla. 2003) (taxpayers who left significant tax liabilities unpaid while they enjoyed a profligate lifestyle had not proven themselves to be the poor but honest debtors for whom the fresh start is intended). The bankruptcy law distinguishes between the debtor with the present ability to pay and does not do so and the unfortunate debtor without a present ability to pay. In <u>In re Angel</u>, 1994 WL 69516, at *4 (Bankr. W.D. Okla. 1994), the court explained the difference:
>
>> Debtors with an inability to pay their taxes with no more culpability will have their tax debts discharged. However, debtors who have cash in hand and, instead of responding to their tax obligations, choose to pay other creditors or purchase luxury items and expensive homes will have their debts excepted from discharge.

<u>Lacheen</u>, 365 B.R. at 486.  Accordingly, this Court must evaluate the Debtor's financial

resources and the amount of his disposable income, and whether he engaged in "lavish

spending" or had a "profligate lifestyle."

The Court finds that Rossman was a hardworking attorney and lobster fisherman. His commendable legal career involved representation of fir fighters and police officers. His work experience demonstrated service to both his country and community. Moreover, his spending was both consistent with a middle or upper middle class lifestyle and his occupation and status in the community. The Court credits his testimony that his spending was motivated by the need and desire to take care of his family, which included a physically disabled son and a son with learning disabilities, as well as his wife's elderly mother.

Rossman expended substantial funds educating his children. In addition, he paid approximately $29,000 for his daughter's wedding, a sum obtained by selling a motorcycle and an antique automobile, which he may have owned before the onset of his tax troubles. Rossman took his family on only two vacations, each costing approximately $3,500, using monies from winning lottery tickets. The spending on the wedding and the vacations by any measure were not excessive.

Although Rossman lives in an expensive home, there was evidence that it greatly appreciated in value from the original purchase price. Moreover, there was no evidence that either the house or its contents were or are opulent. Rossman and his spouse acquired their home for a purchase price of $545,000 in 1993 before the Tax Court issued final decisions in the Rancho Madera Partners case and the Vista Ag-Realty Partners case in 2003 and 2001, respectively.

36

Rossman has leased cars over the years, the IRS failed to introduce evidence that expenses for the vehicles were excessive or unreasonable.  Additionally, while Rossman had a number of bank accounts over the years, none contained vast sums of money which would have permitted him to satisfy the full amount of the $815,739.89 demanded by the IRS, let alone the $1,011,536.50 which was the correct total of the balance due for § 6601 interest and TMT interest. Similarly, the amount of monies in the bank and retirement accounts are insufficient to permit the inference that Rossman could fund his retirement for any length of time with the proceeds.

None of Rossman's expenditures, in this Court's view, were as lavish as the IRS has contended throughout this proceeding.  If Rossman's son did not suffer from a learning disability, then the  amount spent on his education could  be construed as excessive. The education of one's children, however, including the expenditures for Rossman's daughter's college education, cannot be considered profligate, particularly where parents' duties to educate their children is highly personal.  The IRS cannot sustain its burden by suggesting that taking care of one's children, particularly those who are handicapped and disadvantaged by learning disabilities, expressed by a desire to provide them with the best possible education and other advantages (like mobility for a handicapped son via an appropriate vehicle) evidences willful evasion of taxes.

Similarly, the Court finds that Rossman's investment and other accounts were truthfully disclosed and do not evidence willful evasion of taxes.  Rossman's records were transparent and there was no evidence of or suggestion that he has undisclosed bank

accounts in which he conceals assets from the reach of the IRS or other creditors.  Indeed,

the Chapter 7 Trustee filed a Report of No Distribution in his case.  The Court cannot

conclude that Rossman was required to drain every retirement account and abandon his

lobster fishing business to satisfy his obligation to the IRS, pending a final determination

of the amount of interest due.  The Court concludes that the conduct component of §

523(a)(1)(C) is not satisfied simply because Rossman  maintained balances in  savings and

retirement accounts that will provide him with modest resources for his retirement years

or enable him to care for dependents, particularly his physically disabled son, where a

large portion of his obligation to the IRS is the subject of a bona fide dispute before the Tax

Court.

The Court, however, cannot ignore Rossman's earnings in the years after 2002 when

the IRS issued Form 4549A.  Rossman earned substantial income in 2004 and 2005 when

his partnership distributions were $1,620,000 and $660,000, respectively, and his adjusted

gross income was higher as a result of other sources of income.  In those years, Rossman's

income far exceeded his income in both prior and later years.  In view of his substantial

income in those years, the Court finds that the burden of proof shifted to him to explain

how he spent that extraordinary income and why he did not make some payment toward

his tax liabiliy.  He did not address that income during his testimony.  Thus, the

inescapable conclusion is that Rossman had disposable income from which he could have

made some payments to the IRS and the failure to use at least some of that income to

satisfy the increase in tax owed in 1986 (i.e., $157,132) evidences an evasion of tax liability.

38

Both his conduct in failing to make payments toward the balance due from 1986 and circumstantial evidence of willfulness derived therefrom supports the conclusion that he intended to evade at least some part of his obligations to the IRS.  *See* In re Fegeley, 118 F.3d at 938 (conduct requirement satisfied  when debtor in any manner evades or defeats tax liability).

With respect to the intent  component outlined by the court in In re Beninati, 438 B.R. at 758, the IRS established that Rossman had a duty to pay taxes and knew he had such a duty.  Indeed, he knew as early as 1989 that the IRS was conducting a criminal and civil tax investigation of Rancho Madera Partners and Vista Ag-Realty Partners.  In 2001, the Tax Court entered decisions in the two partnership cases resulting in the disallowance of approximately  half  of  the  losses  reported  on  the  partnerships'  returns.    Rossman understood  that  he  was  bound  by  the  two  decisions  even  though  he  did  not  actively participate in either case.  As a result of the two Tax Court decisions, he was notified that he owed an additional tax of $157,132 plus interest.  The amount of the interest far exceeded the amount of the tax.  Although the Rancho Madera Partners case did not become final until some time in 2003, the amount due from Rossman for the increase in underpayment of tax alone did not change.  In September of 2004, the IRS issued a Final Notice of Intent to Levy with respect to the 1986 tax year and levied on Rossman's interest in the Puritan Road property, thereby securing a portion of the amount of tax and interest due.  Rossman then initiated challenges to the TMT interest amount which he had been assessed and sought abatement of interest between 1989 and 1993.  Although his appeal

through the CDP process was denied, the total amount of interest with respect to the 1986 tax remains in bona fide dispute and under advisement with the Tax Court. *See* Rossman v. Comm'r., Case No. 13515-07l, and Houston v. Comm'r, No. 001445-06.

In his case before the Tax Court, Rossman specifically asked the court to find that the Commissioner erred in refusing to consider his objection to the imposition of § 6621(c) or TMT interest; that § 6621(c) interest should not be imposed against him or should be abated with respect to the 1986 liability; that interest pursuant to § 6404(c) from March 19, 1989 to April 1, 1993 should be abated, and that he is entitled to offset his 1995 refund against his 1986 liability. As this Court has found, resolution of Rossman's claims with respect to a substantial amount of interest he owes is before the Tax Court and is unquestionably in bona fide dispute as the issues have been under advisement for over five years as the last docket entry in the Houston v. Comm'r case was on August 20, 2007. *Cf.* Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.), 486 F.3d 940,945 (6th Cir. 2007); In re Taub, 438 B.R. 761, 770-71 (Bankr. E.D.N.Y. 2010).

The facts of this case compel but one conclusion. The IRS established that Rossman intentionally violated the duty to pay the amount of additional tax owed in 1986 and some interest, but not the amount of interest that is subject to dispute in the Tax Court. The Debtor had the ability to make payments toward the balance of taxes owed of $157,132 for 1986, particularly as a result of the income he received in 2004 and 2005 which amounts were substantially greater than years prior to and after those years. Rossman recognized that in view of the successful challenge to the tax status of Rancho Madera Partners and

Vista Ag-Realty Partners, he owed more tax in 1986 than he paid. He testified credibly that upon receipt of the October 8, 2002 Form 4549A Income Tax Examination Change he had no ability to pay the full amount demanded by the IRS, but he had the ability to make some payments to the IRS either from his regular income, particularly in 2004 and 2005 or from his pension income from the Town of Swampscott.

A comparison of the facts in the instant case with those in In re Bryen, 433 B.R. 503 (Bankr. E.D. Pa. 2010), is instructive. Notably, the debtor in Bryen was a licensed certified public accountant who together with his father owned an accounting firm which promoted "tax shelters involving investments in 'employee leasing' partnerships." Id. at 508. The debtor promoted the tax shelters and invested in them in 1980 and 1982. Subsequently, the IRS issued notices of deficiencies to the debtor disallowing his investments in the partnerships for 1980 and 1982, and, following administrative proceedings, the Tax Court issued a decision in a test case finding that the partnerships were shams. Id. at 509. Five years after the decision in the test case, the IRS contacted the debtor and began negotiating the outstanding amount of the tax. Unlike the situation in the instant case, the debtor executed three stipulations setting forth a total amount due in excess of $2.8 million. The stipulations were entered as decisions of the Tax Court. Id. at 510. The debtor never made any payments. He was subsequently assessed for over $13.5 million in 2002. Id.

The court in Bryen found that the debtor's income was at least $62,700 for the years 1996 through 2001 and sometimes was considerably more. Id. at 512. The court also found that the debtor, who lived with a woman whom he eventually married, shared expenses

41

with her with respect to a home she owned, but did not keep a separate bank account, using her account to pay all expenses. The debtor made cash deposits and deposited checks from his accounting firm into the shared account. Additionally, he paid personal expenses from the account of his accounting firm. Id. at 513. The court determined that the debtor's companion purchased property and built a vacation home, which the couple shared, making substantial payments for improvements. Additionally, according to the court, they spent approximately $5,000 on their wedding which occurred in 2001; they sold the couple's former home and purchased another and expended over $11,000 in enhancements.

In addition to housing expenses, the debtor incurred $25,000 in travel-related expenses for airfare and tours in Europe and the Caribbean in 2001 and again in 2002 when the couple continued their world wide travels, including trips to Australia and Central America. The debtor allocated one-quarter of his monthly pay for recreation. Id. at 515. The debtor had only one dependent, his elderly mother. He paid rent for his mother's apartment of approximately $1,200 per month.

In Byren the court concluded that the debtor's obligation to the IRS was nondischargeable, focusing on the debtor's income and modest, fixed living expenses. The court emphasized the debtor's monthly allocation of $2,500 for recreation. Id. at 518. The court also considered the $12,000-$13,000 per year spent on vacations, "the luxury of maintaining two residences," and the "ample income from which he could have made at least some payments on the Tax Debt." Id. The court stated:

42

> I can find no plausible explanation—except to avoid payment to
> creditors—why a sophisticated professional, like the Debtor, who had no
> more than one dependent (his mother), and who was earning sufficient
> income to maintain a comfortable lifestyle, would conduct his personal
> financial affairs without a checking account, transacting his personal business
> entirely in cash or through third parties. This conduct, too, contributes to my
> finding that the IRS has satisfied the "conduct" element of willful evasion
> under § 523(a)(1)(C).

Id. at 518-19.  In affirming both the bankruptcy and district courts, the United States Court

of Appeals for the  Third Circuit stated:

> Once the Tax Court held that his tax shelters were shams, Bryen was aware
> he owed back taxes to the IRS. While he did not know the specific amount of
> the tax deficiency until 2001, he was aware that it would be substantial.
> Nonetheless, Bryen continued to live high on the hog.  He earned income that
> exceeded his modest, fixed living expenses. He made no attempt to save in
> anticipation of the tax debt. Further, after he signed the stipulations with the
> IRS, he did not change his behavior. He did not make any payments to the
> IRS to reduce his tax liability and continued to deal in cash to avoid having
> creditors attach his bank accounts. Thus, the totality of the circumstances
> justify finding that he was attempting to evade his taxes under § 523(a)(1)(C).

449 Fed. App'x 165, 168 (3d Cir. 2011)(footnote omitted).  The Third Circuit also addressed

the debtor's argument that he did not "willfully" evade an assessed tax because the IRS did

not assess the tax until 2002.   The court stated:

> Section 523 only references taxes, not assessed taxes and a delay in
> enforcement cannot mean that a taxpayer, aware that he owed the IRS a
> substantial sum, can never have the requisite intent to evade. As the
> Bankruptcy Court noted, "it is hard to imagine that the outstanding tax debt
> did not loom over [Bryen] like a 'Sword of Damocles.'" In re Bryen, 433 B.R.
> 503, 519 (Bankr. E.D. Pa. 2010). Yet, unlike the Damocles of legend, Bryen
> never sought to give up his lifestyle to free himself of this sword. His
> lifestyle, combined with his deliberate attempts to avoid his creditors,
> justifies the Bankruptcy Court's finding that he acted intentionally and
> voluntarily in evading his tax obligations. See In re Fegeley, 118 F.3d at 984
> (finding that the Debtor's evasion was willful when he "probably had

43

enough money to pay th[e] taxes[,] . . . spent too much[,] . . . was much too lavish[, and] . . . didn't make good judgments about the allocations of his resources."); *see also* In re Gardner, 360 F.3d 551, 561 (6th Cir. 2004) (finding the taxpayer's lifestyle which included numerous vacations coupled with his lack of payment of his tax debt suggested a willful evasion of the tax debt).

Byren, 449 Fed. App'x at 168.

In light of the decision in Bryen and the facts of the instant case, the Court recognizes the difficult issues presented by this case and that it is a close one. The Court credits the Debtor's testimony and the evidence that he did not live lavishly or in any manner attempt to conceal or transfer assets as was the case in Bryen. On the contrary, the Debtor worked hard and took care of his family in admirable ways. The IRS did not contend that he filed a fraudulent return in 1986 or that he knew that Rancho Madera Partners and Vista Ag-Realty Partners were not entitled to their claimed deductions, and that concomitantly he knew that he was not entitled to the deductions in took in 1987, particularly where he consulted with professionals before making the investments. Rossman, however, earned substantial income. The Court concluded that he had the ability to make some payments toward the outstanding tax underpayment from 1986.

In the present case, the Court finds that the IRS satisfied its burden of proof with respect to some, but not all of Rossman's tax obligations.[18] The Court must carve out from

---

[18] The Court has found no case involving a "partial discharge" in a case under 11 U.S.C. § 523(a)(1)(C). There are numerous cases that permit a partial discharge of student loan debt under 11 U.S.C. § 523(a)(8). *See* Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby), 144 F.3d 433, 439-40 (6th Cir. 1998). *See also* Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman), 325 F.3d 1168, 1173 (9th Cir. 2003); Educ. Credit Mgmt. Corp. v. Jorgensen (In re Jorgensen), 479 B.R. 79, 86 (B.A.P. 9th Cir. 2102)("Bankruptcy courts may exercise their equitable authority under § 105(a) to

the exception to discharge, the amount of interest and penalty interest claimed by the IRS

which is the subject of the pending Tax Court action, namely the former § 6621(c) penalty

interest assessed against Rossman with regard to his 1986 federal income tax liability; and

all interest assessed against him with regard to his 1986 federal income tax liability "from

March 19, 1989 to April 1, 1993 under § 6404(e)."   Thus, the underpayment of tax of

$157,132 and any interest which is not the subject of the Tax Court case is

nondischargeable.[19]

---

partially discharge student loans."); <u>Educ. Credit Mgmt. Corp. v. Stevenson (In re Stevenson)</u>, 463 B.R. 586, (Bankr. D. Mass. ), *aff'd,* 475 B.R. 286 (D. Mass. 2012). *But see* <u>Hemer Ins. Corp. of Am. v. Cox (In re Cox)</u>, 338 F.3d 1238 (11th Cir. 2003).

[19] Although the Court shall enter a judgment discharging a substantial amount of interest claimed by the IRS, including all the TMT interest, the IRS lien on the Puritan Road property will pass through the Debtor's bankruptcy unaffected by his discharge. The Debtor's home has appreciated significantly in value.  On the Debtor's Schedule A, he listed the value at $825,000 subject to existing mortgage liens of approximately $111,000 and the IRS lien, which was recorded in 2004.  In January of 2007, the Debtor and his spouse sought to refinance the property to pay the IRS lien.  Although the parties disputed whether the Debtor submitted a request to subordinate lien in a form acceptable to the IRS, the record contained evidence that, in fact, the Debtor through Redding proposed making "a substantial cash payment in addition to the $5,000 per month  installments" from the refinancing to an Appeals Officer in Houston, Texas.  Although the IRS lien was never subordinated, the substantial equity in the Puritan Road property is available to satisfy at least the $157,132 set forth as the balance due on the Form 4549A dated October 8, 2002 and a sizeable amount of the interest claimed.  In this regard, two  points are note worthy: 1) if the Debtor were to divorce his spouse (and they are now separated and living apart), thereby destroying the tenancy by the entirety, and the Puritan Road property were to be sold, the Debtor would have significant equity available to him based upon the 2010 figures used in his schedules which would be subject to the IRS lien; and 2) as noted above, the federal tax lien will pass through bankruptcy unaffected by a discharge of any amount the Debtor owes to the IRS.  *See* <u>In re O'Callaghan</u>, 342 B.R. 364,366-67 (Bankr. M.D. Fla. 2006)("Bankruptcy law clearly holds that a Debtor's discharge for *in personam* liability for taxes does not effect [sic] the *in rem* obligations of a tax lien based on tax liability discharged."  . . . Tax

## IV. CONCLUSION

In view of the foregoing, the Court shall enter judgment in favor of the IRS and against Rossman with respect to the 1986 underpayment of tax and any interest which is not the subject of the Tax Court case of Rossman v. Comm'r.  With respect to the interest and TMT interest which Rossman has challenged  or for which he has sought abatements, the Court finds that the IRS failed to satisfy its burden of establishing a willful attempt to evade or defeat those tax liabilities.  Thus, The Court shall enter judgment in favor of Rossman and against the IRS with respect to those amounts.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated:  December 5, 2012

---

liens "are still valid even though the underlying tax debt is dischargeable." . . .  Tax liens "remain valid and attached to prepetition property despite a discharge.").  *See also* Dewsnup v. Timm, 502 U.S. 410, 417 (1992); U.S. v. Toler, 666 F.Supp.2d 872 (S.D. Ohio 2009); In re Deppish, 227 B.R. 806 (Bankr. S.D. Ohio 1998).